UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM ANDERSON II,

      Plaintiff,

v.

                                    Case No. 12-15384
                                    Honorable Laurie J. Michelson
                                    Magistrate Judge David R. Grand

GENERAL MOTORS, LLC
a limited liability company,

      Defendant.

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [17]**

---

      This is an Americans with Disabilities Act case. Plaintiff William Anderson II, an automobile assembler, alleges that his employer, Defendant General Motors ("GM"), discriminated against him on the basis of his wrist and neck injuries by imposing unnecessary work restrictions, denying him reasonable accommodation for those work restrictions, and by failing to engage in an interactive process to develop accommodations for the restrictions. This matter is before the Court on GM's motion for summary judgment on all of Anderson's claims.[1] (Dkt. 17.) Because GM has not met its initial summary judgment burden on the discrimination claim, but Anderson has not made out a prima facie case of failure to accommodate, the Court GRANTS IN PART and DENIES IN PART Defendant's motion.

---

[1] Anderson has filed another lawsuit alleging the same violations as in this case, but with an additional claim of retaliation. *Anderson II v. General Motors, LLC*, No. 14-12425 (E.D. Mich. filed June 20, 2014). The second lawsuit is also pending before this Court. As discussed during the telephone conference conducted on June 27, 2014, (Dkt. 34), the Court proceeds with the present motion despite the filing of the new case.

## I.      FACTUAL BACKGROUND

The following facts are undisputed for the purpose of Defendants' motion unless otherwise indicated.

### A.      Anderson's Employment History and Injury

William Anderson has worked for General Motors ("GM") as an assembler since 2000. (Dkt. 17-1, Anderson Dep., at 25 [hereinafter "Anderson Dep."].) He started at the Detroit Hamtramck facility; transferred to Pontiac, Michigan in April 2003; transferred to Arlington, Texas in March 2005; and transferred to Toledo, Ohio in March 2012. (*Id.* at 25–27.)

While at Arlington, Anderson sustained two injuries: in October 2006, he tore a ligament in his right wrist, and in December 2008, he fainted and fell, resulting in "herniated disc[s] at C3 through C5" in his neck. (*Id.* at 31.) Anderson began seeing Dr. Clinton Battle for this condition in March 2009. (Anderson Dep. Ex. 4, at 3.) His symptoms included "severe neck and shoulder pain and discomfort." (*Id.*) Battle diagnosed him with cervical disc disease and cervical radiculopathy. (*Id.*)

On March 31, 2012, Battle recommended that Anderson not use his left arm due to the neck injury, not lift more than thirty pounds, refrain from repetitive motion of the right wrist, and not push, pull, or lift over ten pounds with the right wrist. (*Id.* at 46.) Anderson did not inform anyone at the Toledo plant of his restrictions before his arrival. (*Id.* at 39, 53.) This lawsuit arose from GM's response to Anderson's injuries.

### B.      GM's Medical Restriction Policy

Relevant to the events at issue in this case is a joint program between General Motors and the United Automobile Workers ("UAW"): Accommodating Disabled People in Transition ("ADAPT"). The goal of the ADAPT program is to help employees with physical restrictions get

2

back to work. At the Toledo plant, during the relevant time period, the program was administered by GM labor relations department employee Pat Gallagher and UAW representative Tim Gorsuch.

GM's usual policy for medical restrictions is as follows: first, the employee presents to the "[GM] Medical Department with physical limitations from their attending physician"; second, "the Medical Department reviews those"; third, "the [GM] doctor determines which restrictions would be applicable for the employee" and puts those restrictions in writing; fourth, "the employee . . . takes their restrictions back to their supervisor who then attempts to place the employee on a job that accommodates their physical limitations." (Dkt. 17-3, Gallagher Dep. at 12 [hereinafter "Gallagher Dep."].) If the supervisor is unable to place the employee, the supervisor asks a manager to "try to find a job placement within their manufacturing business team in the broader team." (*Id.* at 12.)

If the manager is unable to find a placement, the employee would go back to the Medical Department and "at that point the ADAPT team would be notified, which would be Tim [Gorsuch] and [Pat Gallagher]." (*Id.* at 12.) Gorsuch and Gallagher would then try to place the employee in some other position within the "manufacturing environment" and failing that, they would "notify the employee that we are placing him on the No Job Available Within Restrictions status." (*Id.* at 13.)

Once an employee is placed on No Job Available status, the default is to give the employee a "return to work date" for re-evaluation three months after the status becomes effective. (*Id.* at 13.) During those three months, the employee is placed on sick leave and he or she must inform the National Benefit Center of the sick leave status. (*Id.*) If "anything

changes . . . they are certainly welcome to come back and present any new information" that might change the medical restrictions. (*Id.*)

### C.     Anderson's Transfer to Toledo

In March 2012, Anderson applied to transfer to GM's Toledo, Ohio manufacturing plant. The Toledo plant manufactures "several varieties of automatic transmissions for the use in General Motors vehicles." (Gallagher Dep., at 7.) Anderson was due to report on April 14, 2012. (Anderson Dep., at 49.) When Anderson accepted the offer to work in Toledo, he was on sick leave from the Arlington plant because his "arm [injury] was re-aggravated while [he] was still working" in Texas. (Anderson Dep. at 36.) Anderson underwent a "Functional Capacity Evaluation" for worker's compensation purposes on March 28, 2012. (Pl.'s Resp. Br. Ex L [Filed under Seal].) The physical therapist concluded that "the patient has met the physical demands of his job at GM" but recommended a medical review. (*Id.* at 3.) On April 5, 2012, Battle issued a release for Anderson: "Patient can go back to work with restriction on file." (Anderson Dep. at 46; Anderson Dep. Ex. 7 at 1) Anderson testified that he asked Battle to issue the release because the time off work had allowed his arm to "get better" and he felt that he was ready to work. (Anderson Dep. at 46.)

On the second day of orientation in Toledo, April 15, labor-department representatives pulled Anderson and a few other co-workers aside and told them they were in the system as "on leave." (*Id.* at 50.) The representatives asked if the workers had notes from their physicians. (*Id.* at 50.) Anderson produced Battle's April 5 note. (*Id.*) The representatives then allegedly told Anderson that the Toledo plant would not accept people with restrictions, (*Id.* at 50), though GM disputes that any of their employees made such an assertion. Anderson and the other workers were instructed to leave the premises. (*Id.*) Kevin Jacobs, a nurse supervisor at GM, testified at

4

his deposition that in fact GM has an internal policy that workers are "not to complete transfers when they're out on medical. They need to . . . be an active employee." (Dkt. 19-23, Kevin Jacobs Dep., at 48.) Eventually, however, GM decided to clear the "on leave" employees through the Toledo medical department instead of sending them back to their old plants because of the distance between the plants. (*Id.* at 51.)

This process began when Kevin Jacobs reviewed Anderson's medical records in an internal records system, MedGate, and documentation from Sedgwick, GM's benefits administrator. (*Id.* at 47; Dkt. 19-5, MedGate Entries (noting on April 17 that GM would "Need to review case and paperwork since employee is from Arlington, TX plant.").) MedGate is a GM database that contains information regarding GM employees' "sickness and accident and work[ers] comp claims." (*Id.* at 16.) Based on the information in Anderson's MedGate file, and without having examined Anderson in person, Jacobs added the following note to Anderson's chart:

> EE to return to work with same restrictions as previously issued by PCP. EE seen IME physician who determined the EE should have surgery immediately. Will have Dr. Roth review case. Because of the restrictions that will be continued, no job will be available in the plant.

(*Id.* at 55–56; MedGate Entries.) Jacobs pulled the restrictions to be continued from Anderson's MedGate chart. (Jacobs Dep. at 73–74.) They were as follows:

> RESTRICTIONS TO READ;
> NO LIFTING > THAN 30 LBS;
> RT NO PUSH/PULL > 7 LBS;
> RT NO TWISTING OF RT WRIST;
> NO LIFTING RT > 5LBS;
> LT NO CARRY/LIFT/PUSH/PULL > 10 LBS.

(Dkt. 19-4, List of Restrictions.) Jacobs testified that these restrictions did not necessarily correlate to Anderson's previous restrictions, but that he wanted to be "conservative" so that Anderson would not reinjure himself. (Jacobs Dep. at 57.)

Anderson returned to the Toledo plant for a medical exam with GM physician Dr. Victor Roth on April 23, 2012. (*Id.* at 58.) According to Anderson's recollection, the exam lasted about five minutes and involved a "strength test . . . pull[ing] my hand, writ[ing], hit[ting] the kneecap with a thing to see your reflexes, hit[ting] my . . . elbows, check[ing] the reflexes, turn[ing] neck to the left [and] right . . . ." (*Id.* at 58.) The grip-test (presumably the "strength test" Anderson mentioned in his deposition) that Roth performed was "normal." (Roth Dep. 130–31.) Roth also asked about Anderson's medical history, including a previous doctor's recommendation that Anderson have neck surgery. (*Id.* at 59–60.) Anderson explained that he had considered having the surgery but that he thought that he could work through the pain. (*Id.* at 59–60.) At this point, Anderson was taking "Motrin 800 and Hydrocodone [Vicodin] 750, 7.5" for his neck pain but did not feel that the pain would inhibit his ability to work, and that his wrist "wasn't an issue" so long as he "didn't aggravate it." (*Id.* at 60.)

After the exam, Roth sent Anderson to the lobby so that Roth could review Anderson's medical records. (*Id.* at 59.) The medical records available to Roth were those contained in MedGate and included the restrictions that Jacobs had issued. (Dkt. 17-5, Roth Dep., at 127 [hereinafter "Roth Dep."].) Roth testified that he was not consulted on the Jacobs restrictions, but he did look at them to determine what restrictions to issue. (Roth Dep. at 128.)

On the same day, Roth issued the following restrictions: (1) no carrying, lifting, pushing, or pulling more than ten pounds with the left arm; (2) no lifting over thirty pounds; (3) no pushing or pulling more than seven pounds with the right arm; and (4) no twisting of the right

6

wrist. (Roth Dep., at 131–32 [hereinafter "Roth Dep."]; List of Restrictions.) ADAPT representatives were unable to place Anderson in a job that accommodated these restrictions, so Anderson was placed on a three-month leave pursuant to the ADAPT policy until July 23, 2012. (Roth Dep. Ex. 9.)

Anderson disagreed with the restrictions: he said that his wrist did not hurt unless he moved "it back and forth aggravating it" and his "neck wasn't the issue either . . . because [he] didn't have restrictions for [his] neck," although he did report that his neck was in constant pain and that he was still taking medication for it. (*Id.* at 67–68.) Presumably, Anderson was referring to the restrictions from Battle, which, according to Anderson, had been rescinded.

During this time, on May 1, 2012, Anderson filed a charge of discrimination with the Michigan Equal Employment Opportunity Commission, alleging that he was denied work at the Toledo plant based on his work restrictions. He alleged that he "was not given the opportunity to ask for a reasonable accommodation, nor did [he] need one as [he] was able to complete the functions of [his] job." (Anderson Dep. Ex. 17.)

At the end of the three-month leave period, on July 23, 2012, Roth reevaluated Anderson and issued new restrictions. (Anderson Dep. at 69.) The restrictions were as follows: (1) limit push/pull with left arm to under ten pounds; (2) no lifting over fifteen pounds; (3) no work past desk level with left arm; (4) no overhead work; and (5) no repetitive movement with left arm. (Anderson Dep. Ex. 9 at 2.) ADAPT representatives Tim Gorsuch and Pat Gallagher explained to him that they still could not match him with a job given his neck and wrist restrictions, and that he should come back in three months. (*Id.* at 74.) Anderson then traveled to Texas to see Dr. Battle. (*Id.*) On July 26, 2012, Battle issued another note instructing that Anderson "[could] go

back to work with no restriction on [left] arm. Restriction on file are for his [right] wrist." (Anderson Dep. Ex. 10.)

On October 23, 2012, Anderson again reported to Toledo medical. (*Id.* at 78.) At the time, he had not obtained a local doctor. He told Roth that there were no changes in his status. (*Id.* at 78.) Roth renewed his previous restrictions. (*Id.* at 78.) At this point, Anderson appeared on an internal "Do Not Allow In List" of employees who were denied access to the Toledo plant pending personnel action. (Dkt. 19-16, Do Not Allow In List.) This meant that Anderson needed to "contact a member of Management to provide an escort to Medical to be cleared" before he could enter the plant. (*Id.*)

### D. Anderson Files Suit

Anderson filed this lawsuit on December 7, 2012, (Dkt. 1), alleging that GM discriminated against him on the basis of his disability (his neck and wrist injuries) by denying him reasonable accommodation. (Compl. ¶ 26.) He alleged that GM imposed unnecessary restrictions on his work. (Compl. ¶ 14.) In his deposition, Anderson explained that by "unnecessary restrictions" he meant "anything to do with my left area of my back and shoulder." (Anderson Dep. at 107.) He did not think that he in fact needed any medical restrictions in Toledo. (*Id.* at 108.) To that end, he also alleges that GM "has failed to engage in a good faith interactive accommodation process" in violation of 29 C.F.R. § 16302(o)(3). (Compl. ¶ 18.)

Even as this lawsuit commenced, Anderson attempted to return to work at the Toledo plant. By his next visit on January 24, 2013, he had obtained a local doctor and Roth advised him to see the new doctor as soon as possible. (Anderson Dep. at 83–85.) But Roth also talked to Anderson about his restrictions that day and changed his restrictions as follows: (1) limit lifting to 15 pounds; and (2) limit neck movement right, left, up, down. (*Id.*; Roth Dep. at 174–77.)

8

Roth also extended Anderson's wrist restrictions. (*Id.*) Anderson then spoke with the ADAPT representatives but they told him that there were no jobs available for someone with these restrictions and said that Anderson should come back on March 7, 2013. (*Id.*)

Shortly thereafter, Anderson saw his new doctor, Toledo-area internist Dr. Yashinsky, who referred him to a local surgeon, Dr. Park. (Anderson Dep. at 89.) Dr. Park recommended surgery to remove the bone spurs in Anderson's neck; Anderson scheduled the procedure for June 17, 2013. (*Id.* at 90.) Dr. Park declined to issue or modify any work restrictions until after surgery, however. (*Id.* at 90–92.) Nor did Dr. Yashinsky issue any additional restrictions. (*Id.* at 88.)

Anderson informed GM of his planned surgery when he returned to the Toledo plant on March 7, 2013. Roth renewed his prior restrictions pending the surgery. (*Id.* at 94.) The ADAPT representatives were still unable to place Anderson in a job that fit his restrictions. (*Id.* at 96.) The same occurred on March 26, 2013. (*Id.* at 97.)

Anderson underwent the surgery, a discectomy procedure, on June 17, 2013. (*Id.* at 102.) After a follow-up visit, Dr. Park told him that he could return to work on September 5, 2013. (*Id.* at 104.) Anderson in fact returned to work as an assembler without any restrictions at the Toledo plant on November 1, 2013. (Dkt. 17-6, Gallagher Decl., at ¶ 2.) While he was on leave, he received worker's compensation and disability benefits and maintained his GM medical benefits (Anderson Dep. at 121.)  He did not receive holiday pay or the regular June performance bonus. (Anderson Dep. at 122.)

Defendants filed their motion for summary judgment on February 28, 2014. (Dkt. 17.) Aside from the EEOC charge of May 1, 2012, and the Internal Grievance of March 7, 2013, Anderson has not filed any other grievances. (Anderson Dep. at 101.) He did, however, file

9

another complaint in this Court, alleging that GM retaliated against him for filing the present lawsuit. *Anderson II v. General Motors, LLC*, No. 14-12425 (E.D. Mich. Filed June 20, 2014).

## II.   STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). On a motion for summary judgment, the court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted); Redding v. St. Edward, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party may discharge its initial summary judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party does so, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita, 475 U.S. at 587. The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. Anderson, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

## II.    ANALYSIS

The Americans with Disabilities Act ("ADA") makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). A "qualified individual" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "'Discrimination' under the ADA is a general term that encompasses, among other theories, disparate treatment, harassment, and failure to accommodate." *Wells v. Chrysler Group LLC*, 2014 U.S. App. LEXIS 9164, at *7 (6th Cir. May 15, 2014).

Anderson alleges three discrete ADA violations within his one-count Complaint: (1) a discrimination claim based on GM's failure to accommodate his restrictions (Compl. ¶ 26); (2) an independent failure to accommodate claim based on essentially the same facts (Compl. ¶ 24); and (3) a claim for GM's failure to engage in an interactive process (Compl. ¶ 25).

GM argues that Anderson's ADA claims fail as a matter of law because (1) "Plaintiff cannot prove he was 'otherwise qualified' for any assembler position at the Toledo plant during the relevant timeframe"; (2) "Plaintiff [cannot] prove that GM failed to accommodate him, as he contended that he did not need any accommodation"; and (3) "Plaintiff was placed on medical leave . . . which is an appropriate accommodation." (Dkt. 17, Def.'s Br., at 1.)

The Sixth Circuit prescribes the following framework for "discrimination claim[s based] upon an employer's failure to accommodate [a] disability":

(1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is 'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business

11

necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*EEOC v. Ford Motor Co.*, 752 F.3d 634, 640 (6th Cir. 2014) (citing *Klieber v. Honda of Am. Mfg., Inc.* 485 F.3d 862, 868 (6th Cir. 2007)). "[F]ailure to accommodate an individual's disability may qualify as discrimination." *Walsh v. UPS*, 201 F.3d 718, 724 (6th Cir. 2000).

But failure to accommodate is also an independent claim with its own legal standard:

> In order to establish a prima facie case for failure to accommodate, a plaintiff must show that: (1) [he] is disabled within the meaning of the Act; (2) [he] is otherwise qualified for the position, with or without reasonable accommodation; (3) [his] employer knew or had reason to know about her disability; (4) [he] requested an accommodation; and (5) the employer failed to provide the necessary accommodation.

*Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982–983 (6th Cir. 2011). GM does not dispute that Anderson was disabled.

Common to both Anderson's claim of discrimination and his claim for failure to accommodate, then, is his burden to prove that he was "otherwise qualified" for the position of assembler. GM's arguments as to Anderson's accommodations, on the other hand, are relevant only to his failure to accommodate claim. As such, the Court will examine the "otherwise qualified" factor before moving to the accommodation arguments.

## A.   "Otherwise Qualified"

GM's motion for summary judgment asserts that Anderson cannot prove that he was "otherwise qualified" to perform the assembler job. Whether Anderson was "otherwise qualified" to perform the assembler job at the Toledo plant depends on whether he could perform its "essential functions." *Keith v. County of Oakland*, 703 F.3d 918, 925 (6th Cir. 2013) ("[A]n individual is 'otherwise qualified' if he or she can perform the 'essential functions' of the job with or without reasonable accommodation." (citing 42 U.S.C. § 12111(8))).

12

Here, Anderson argues that he was capable of performing the essential functions[2] of the assembler job without accommodation. (Pl.'s Resp. Br. at 23.) In fact, the full thrust of Anderson's argument is that not only was he capable of performing the essential functions of the assembler position, but also that GM erroneously concluded that he needed any medical restrictions for his neck injuries in the first place. (See Pl.'s Resp. Br. at 18–23; Pl.'s Sur-Reply Br. at 2–3.) Therefore, he asserts, in imposing these restrictions, GM failed to meet the "threshold matter," *Keith v. County of Oakland*, 703 F.3d 918, 925 (6th Cir. 2013), of performing an individualized inquiry into his medical status. At oral argument, counsel for GM also indicated that the Court should consider this issue in deciding the present motion. Accordingly, the Court will analyze the question of the individualized inquiry and then move to the essential functions analysis.

### 1. Individualized Inquiry

Under the ADA, an employer "must conduct an individualized inquiry into the individual's actual medical condition, and the impact, if any, the condition might have on that individual's ability to perform the job in question" before making a decision as to the employee's ability to perform in a job. *Holiday*, 206 F.3d at 643.[3] It does not appear that the Sixth Circuit has

---

[2] ADA regulations provide that "essential functions" are job duties that are "fundamental" rather than "marginal." 29 C.F.R. 1630.2(n)(1). A job function may be deemed "essential" because (1) the position exists to perform that function; (2) there is a limited number of employees available to perform that job function; (3) or the function is highly specialized such that the worker is hired "for his or her expertise or ability to perform the particular function." 29 C.F.R. § 1630.2(n)(2). "Whether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Keith*, 703 F.3d at 926.

[33] Because GM has not asserted a "direct threat" defense, the Court will not engage in the "risk analysis" prescribed by 29 C.F.R. 1630.2(r). *See Jennings v. Dow Corning Corp.*, 2013 U.S. Dist. LEXIS 66803 at *27 n. 9 (E.D. Mich. May 10, 2013) (explaining that while the Sixth Circuit has not yet ruled on the issue, its sister circuits appear split on whether to assign the burden of proof for a direct threat analysis to ADA plaintiffs as part of the prima facie case or only to defendants who raise 'direct threat' as an affirmative defense).

adopted a strict rubric to evaluate such assessments, especially where a direct threat defense has not been asserted, but the parties have presented cases that provide a useful comparison for GM's evaluation of Anderson.

In *Jennings v. Dow Corning Corp.*, No. 12-12227, 2013 U.S. Dist. LEXIS 66803, at *3 (E.D. Mich. May 10, 2013), plaintiff Jennings was denied a position as a Loss Prevention Officer ("LPO") at a Dow chemical manufacturing plant following a pre-employment medical evaluation conducted by defendant's Employee Health Services Department. *Id.* at *5. Jennings brought suit under the ADA, and on cross motions for summary judgment the court examined the issue of whether Dow Corning had conducted an ADA-compliant individualized inquiry before imposing work restrictions. *Id.* at *6. Dow Corning's physician, Dr. Mankani, had found that Jennings was incapable of performing the LPO job without restrictions based on his review of "[a Physician's Assistant's] physical examination findings, Plaintiff's medical test results, and a complete, up-to-date medical history." *Id.* at *11. The exam by the Physician's Assistant tested Jennings' "range of motion, grip strength, functional tests, and lifting capabilities" and examined his "vision, hearing, and cardiac health." *Id.* at *4. The medical history available to Dr. Mankani included records from the physicians who treated plaintiff for his back pain and his other injuries. *Id.* The examination revealed that Jennings suffered from chronic back pain; the medical records revealed that this pain had been ongoing for the previous six years and that Jennings had had prior surgeries for other physical problems including a traumatic shoulder injury. *Id.* at *7–9. On this record, the court granted summary judgment to Dow Corning: "Dr. Mankani did have the benefit of an in person exam — conducted by his own physician's assistant, which he then discussed with her at length. His review was based on objective evidence directly related to Plaintiff; in fact, Dr. Mankani reviewed the current records from all of Plaintiff's treating

14

physicians (unlike Dr. Peppler, Plaintiff's own expert)." *Id.* at \*29–30. This "extensive review" constituted an individualized inquiry under the ADA as a matter of law. *Id* at \*30.

In *Lafata v. Dearborn Heights School District No. 7*, No. 13-10755, 2013 U.S. Dist. LEXIS 173731, at \*4 (E.D. Mich. Dec. 11, 2013), the defendant School District extended to Lafata an offer of employment as a Plant Engineer contingent on his passing a physical exam. After the exam, plaintiff was denied employment and brought suit under the ADA. *Id.* at \*5. On cross motions for summary judgment, the court examined whether the physical exam constituted an ADA-compliant individualized inquiry. *Id.* at \*4. The exam was conducted by an outside contractor physician. *Id.* at \*6. The physician, Dr. Perlson,  observed plaintiff's "squatting, standing, stooping, and balance" and also examined his torso and limbs for muscle atrophy. *Id.*at \*7–8. Based on this exam, Dr. Perlson diagnosed Lafata with Charcot Marie Tooth syndrome, a genetic disorder that causes muscle deterioration, and eventually concluded that plaintiff needed restrictions in order to be able to work. *Id.* at \*7–9. A second doctor came to the same diagnosis but found that Lafata could work without restrictions. *Id.* Nonetheless, the School District concluded that Lafata could not perform the essential functions of the position and did not consider evidence contrary to Dr. Perlson's findings. *Id.* at \*17. The court held that the School District was not entitled to summary judgment on the issue for two reasons: first, "Dr. Perlson was not Plaintiff's treating physician and he based his recommendations on nothing more than a cursory physical examination of Plaintiff"; second, "there was evidence available and known to the School District that contradicted Dr. Perlson's recommendations that it did not consider." *Id.* at \*29. Rather, the court held Lafata was entitled to summary judgment:

> The following are what entitle Plaintiff to prevail on his motion. First is the undisputed fact that neither Dr. Perlson nor the School District engaged in any analysis to determine whether reasonable accommodations were available that could enable Plaintiff to perform the essential functions of the position despite his

> disability and purported physical restrictions. Second is the School District's
> failure to rebut Plaintiff's showing that he could perform those functions without
> or, if necessary, with reasonable accommodations.

*Id.* at *29. Thus, while the School District was not entitled to summary judgment because of deficiencies in the medical exam itself, Lafata was entitled to summary judgment due to the court's finding that the School District failed to engage in any accommodation analysis and failed to address evidence that Lafata could perform without accommodation.

Here, only GM has moved for summary judgment. Therefore, the question before the Court is whether the exam that Roth performed constituted an individualized inquiry as a matter of law. Because there are questions of material fact regarding the adequacy of the exam, the Court cannot make such a finding. GM argues that "Roth . . . issued Plaintiff's restrictions after conducting an individualized assessment over a period of several months, which included a review of Plaintiff's medical records, multiple physical examinations, and numerous discussions with Plaintiff." (Dkt. 17, Def.'s Br., at 11), and that the medical history available to Roth included "medical documentation from Sedgwick, GM's benefits administrator"; information from Medgate, "GM's electronic medical information repository"; a report from a July 12, 2012 designated doctor's exam; notes from Battle and Dr. Park; and, an MRI report for Anderson's wrist and neck. (*Id.* at 5.)

Anderson first points out that it is unclear from the record whether Roth had Anderson's complete medical history available to him. (Pl.'s Sur-Reply at 4.) To be sure, Roth did not have the July 12, 2012 report or the note from Dr. Park available to him when he issued the April 23 restrictions. And Anderson says that Roth's deposition exhibits, which purportedly contained copies of the medical information Roth had at his disposal, included records mailed to GM *after*

16

the lawsuit began. Anderson says that due to the mailing dates, Roth could not have considered these documents as part of his assessment. (Pl.'s Sur-Reply at 3 (citing Roth Dep. Ex. 3).)

Moreover, it is troubling that Roth initially issued restrictions that were nearly identical to those entered by nurse supervisor Jacobs when Jacobs had not had the benefit of an in-person exam and had not consulted with Roth. In *Jones v. Nissan North America, Inc.*, 438 F. App'x 388, 401 (6th Cir. 2011), the Sixth Circuit examined Nissan's reliance on a worker's compensation order to determine medical restrictions for an employee returning to work from injury. The court noted that "Nissan's own physician never saw Jones or even evaluated his medical file and instead placed medical limitations on Jones citing a 'recent judicial ruling.'" *Id.* This was not enough under the ADA: "Although Nissan disavows sharing the chancellor's view of Jones's limitations, it nevertheless drew unfounded inferences from those findings, leading it to impose unsupported medical restrictions on Jones. This constitutes discrimination under the ADA." *Id.* at 402.

True, this case differs from *Jones*: Jacobs testified that he entered the restrictions after examining restrictions and reports from other physicians rather than a worker's compensation order. Still, the *Jones* court observed that "[t]he law is clear that an employer cannot simply rely on a third-party's assessment that an employee is disabled." *Id.* at 401 (citing *Holiday*, 206 F.3d at 643). Perhaps there is an argument that Roth merely came to the same conclusions as Jones even with the benefit of a physical exam; however, Roth's exam was clearly less extensive than the exams in either *Lafata* or *Jennings*. More specifically, Roth testified that his initial exam of Anderson consisted of only one objective test, a grip-strength test, which was normal. (Roth Dep. at 131.) When Roth saw Anderson three months later, he did not do any physical examination and did not have certain medical records available to review. (*Id.* at 147–48). In October 2012,

17

Roth simply did a range of motion evaluation, with a finding of "limited," and a grip strength test, with a finding of "normal." (*Id.* at 165). Roth could not recall what he did during the alleged January 24, 2013, exam. (*Id.* at 179.) Roth never spoke with Anderson's treating physician, Dr. Battle, (*id.* at 151–52), and it does not appear he gave any consideration to the restriction changes made by Dr. Battle. Unlike the physician in *Jennings*, Roth did not review all of Anderson's medical records before imposing the extensive work restrictions.

The Court finds that there are unresolved questions of material fact regarding the adequacy of Roth's examinations, the medical records available to Roth, and Roth's possible reliance on the Jacobs restrictions. Thus, summary judgment is not warranted on the individualized inquiry issue.

### 2.  Essential Functions

Even if the Court were to find that, as a matter of law, GM performed a sufficient individualized inquiry, the Court would still need to evaluate whether Anderson, with the restrictions imposed as a result of the individualized inquiry, could perform the essential functions of the assembler job in order to complete the "otherwise qualified" analysis. Ultimately, the burden of proof on this issue will rest with Anderson. *See Hamlin v. Charter Twp. of Flint*, 165 F.3d 426, 428 (6th Cir. 1998). But because GM has moved for summary judgment, it bears the "initial responsibility" to "inform[] the district court of the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 322–23.

GM does not indicate which job functions at the Toledo plant were considered "essential," nor does it indicate why Anderson could not perform those functions (whatever they

18

may be.) GM's motion merely asserts–without reference to the record—that Anderson "cannot establish that he could perform the essential functions." (Def.'s Br. at 11.) And at oral argument, GM's counsel was unable to identify the essential functions of the assembler job. Although "[c]onsideration shall be given to the employer's judgment as to what functions of a job are essential," 29 C.F.R. § 1630.2(n), this does not mean that GM is excused from its burden on summary judgment, nor does it mean that GM can merely assert that Anderson could not meet unspecified requirements in order to merit summary judgment. Indeed, "[a]t the summary judgment stage, the employer's judgment will not be dispositive on whether a function is essential when evidence on the issue is 'mixed.'" *Rorrer*, 743 F.3d at 1039.

True, Anderson's briefing is likewise devoid of any argument regarding essential job functions at the plant. But this does not automatically entitle GM to summary judgment:

> A trial court, in reviewing a motion for summary judgment, holds the moving party to the burden established by the plain language of Rule 56: to show 'that there is no genuine issue as to material fact, and that the moving party is entitled to a judgment as a matter of law.' The fact that the non-moving party does not respond, or that the motion may otherwise seem to be unopposed, does not change this requirement or lessen the burden on the moving party or the court.

*Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 410 (6th Cir. 1992) (citation omitted).

Although the foregoing might suffice to end the summary judgment inquiry, both parties referenced deposition testimony in their briefing relevant to the essential-function element. As such, the Court will consider that testimony in determining whether GM is entitled to summary judgment. *See Guarino*, 980 F.2d at 410 ("In the absence of a response [from the non-moving party], the court must review carefully those portions of the submitted evidence designated by the moving party. Neither the trial nor appellate court, however, will *sua sponte* comb the record from the partisan perspective of an advocate for the non-moving party. Rather, in the reasoned exercise of its judgment the court may rely on the moving party's unrebutted recitation of the

19

evidence, or pertinent portions thereof, in reaching a conclusion that certain evidence and inferences from evidence demonstrate facts which are 'uncontroverted.'").

Here, GM has directed the Court's attention to ADAPT representative Pat Gallagher's deposition—specifically, those portions where Gallagher explains why there were no jobs to accommodate Anderson's restrictions in Toledo. Similarly, Anderson's response brief isolates portions of Gallagher's deposition that explain which "restrictions . . . were keeping him off work." (Pl.'s Resp. Br., at 9.)

Gallagher's testimony reveals only that the assembly jobs at the Toledo plant involved the extensive use of both hands (Gallagher Dep., at 17); the ability to work above desk level (*id.* at 23); and the ability to engage in repetitive tasks (*id.* at 54). Gallagher also testified that a lifting restriction of under five pounds would be "pretty prohibitive for the operations we have in our plant." (*Id.* at 25.) But Gallagher's testimony stops short of explicitly stating that GM considered any of these functions to be essential at the Toledo plant. (*See Id.* at 25) Thus, the record remains unclear as to which Toledo job functions were "essential."

It is also unclear why Anderson could not perform the functions that Gallagher deemed important (but perhaps not essential). Both parties acknowledge that Anderson's restrictions permitted him to lift up to ten or fifteen pounds at different points during the relevant time period; meanwhile, Gallagher's testimony merely indicates that a five-pound restriction would preclude an employee's ability to perform the assembler job. Moreover, both parties acknowledge that another Toledo transfer who had been on medical leave, Jessica Corr, was able to work in the Toledo plant, and the record does not explain whether she had restrictions and if so, whether her restrictions were more stringent than Anderson's (or whether she worked with accommodations). (*See* Dkt. 26, Def.'s Reply Br., at 4; Anderson Dep. at 55.) Finally, Anderson

points to an August 28, 2012, functional capacity exam report wherein physical therapist Jim Mallard concluded that "the patient has met the physical demands of his job at GM." (Pl.'s Resp. Br. Ex. L [Filed under Seal], at 3.)

In all, the Court concludes that GM has not met its initial burden on summary judgment, and that a review of the record portions flagged by the parties indicates that there are issues of material fact as to whether Anderson could perform the "essential functions" of the assembler job at the Toledo plant. Therefore, summary judgment is inappropriate for Anderson's discrimination claim.

### B.       Failure to Accommodate

Employees asserting a failure to accommodate claim, as Anderson does here, "bear[] the burden of proposing reasonable accommodations; an employee's claim must be dismissed if the employee fails to identify and request such reasonable accommodations." *Johnson*, 443 F. App'x at 983. Anderson has not presented any evidence that he ever requested an accommodation; as such, he cannot survive GM's motion for summary judgment even though there are fact questions going to the "otherwise qualified" element. The record indicates that Anderson did not request any accommodation when he met with the ADAPT representatives. (*See* Gallagher Dep. at 66–67; Anderson Dep. at 73.) Anderson acknowledges that he did not request an accommodation for his neck injuries in his response brief but asserts, without citing to the record, that he did request an accommodation for his right wrist. (Dkt. 19, Pl.'s Resp. Br., at 23.) Without support from the record, this allegation does not create a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A); *see also Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009) ("A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party.").

Moreover, Anderson argues that, at least with respect to his neck restrictions, GM "regarded him as" disabled.[4] (Pl.'s Resp. Br., at 16–18.) The Court makes no finding on this matter because GM has not asserted it as a basis for summary judgment and at oral argument, counsel for GM indicated that GM does not dispute that Anderson was subject to ADA protections. The Court notes, however, that a conclusion that Anderson was in fact "regarded as" disabled would "obviate [GM's] obligation to reasonably accommodate." *Workman v. Frito-Lay, Inc.*, 165 F. 3d 460, 467 (6th Cir. 1999); *see also Baker v. Windsor Republic Doors*, 414 F. App'x 764, 776 (6th Cir. 2011) ("Despite the lack of analytical support for *Workman's* assertion that a finding of 'regarded-as' disability would obviate an employer's responsibility to offer reasonable accommodation to an employee, that holding remains the 'law of the circuit' and binds this panel."); A. Larson, Employment Discrimination § 153.09 (2d ed. 2014) ("[T]here now exist two different protected groups under the ADA: those who satisfy the traditional definition of disability, and . . . those who are discriminated against on the basis of their actual or perceived nontrivial impairments. The first group has both nondiscrimination and accommodation rights, but the second, only the right not to be discriminated against.").

### C.    Failure to Engage in an Interactive Process

Anderson's claim for failure to engage in an interactive process likewise fails because he has not identified evidence in the record reflecting that he requested an accommodation. "The ADA's regulations indicate that "[t]o determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive

---

[4] The ADA provides that individuals may be considered "disabled within the meaning of the Act" and therefore qualify for ADA protection in three circumstances: if the individual (1) has "a physical or mental impairment that substantially limits one or more major life activities of such individual;" (2) has "a record of such an impairment;" or (3) is "being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. 12102(1).

process with the [employee]." *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 871 (6th Cir. 2007) (quoting 29 C.F.R. § 1630.2(o)(3)). "Although mandatory, failure to engage in the interactive process is only an independent violation of the ADA if the plaintiff establishes a prima facie showing that he proposed a reasonable accommodation." *Rorrer*, 743 F.3d at 1041. This is because an employer's duty to engage in an interactive process is only triggered by an employee's request for a reasonable accommodation. *Melange v. City of Ctr. Line*, 482 F. App'x 81, 86–87 (6th Cir. 2012) (granting summary judgment to an employer on an interactive process claim where the employer received a letter from the employee's physician barring him from returning to work and the employee never requested an accommodation). Because Anderson has not made a prima facie showing that he proposed a reasonable accommodation, he cannot move forward with his claim under 29 C.F.R. 16302(o)(3).

## III.    CONCLUSION

The record presents genuine issues of material fact as to whether Anderson was "otherwise qualified" to perform the job of assembler at GM's Toledo, Ohio plant. There is no genuine dispute as to whether Anderson requested accommodation: he has not pointed to evidence in the record showing that he did. Therefore, Anderson's discrimination claim survives summary judgment, but his claims of failure to accommodate and failure to engage in an interactive process do not.

Accordingly, the Court **GRANTS** GM's motion for summary judgment as to the failure to accommodate and failure to engage in an interactive process claims and **DENIES** GM's

motion as to the discrimination claim.

**IT IS SO ORDERED**.


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  September 12, 2014


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on September 12, 2014.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson